THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOSEPH GIULIANO, Appellant.

First Department, July 12, 1984

### APPEARANCES OF COUNSEL

*Irving Anolik* and *Morris D. Weintraub* for appellant.

*Harold Kenneth King, Jr.,* of counsel (*Steven R. Kartagener* with him on the brief; *Mario Merola, District Attorney,* attorney), for respondent.

### OPINION OF THE COURT

FEIN, J.

There should be an affirmance in this wholly circumstantial evidence case. If believed by the jury, as apparently it was, the evidence was sufficient to exclude to a moral certainty every conclusion other than guilt.

As stated in *People v Kennedy* (47 NY2d 196, 202): "[T]he conclusion of guilt must be consistent with and flow naturally from the proven facts, and * * * those facts viewed as a whole must exclude 'to a moral certainty' every conclusion other than guilt" (citing *People v Cleague,* 22 NY2d 363, 367; *People v Benzinger,* 36 NY2d 29).

The evidence is sufficiently discussed in the concurring and dissenting opinions.

There are three troublesome questions. The first two deal with motive. Defendant had no apparent motive.

Olivieri, one of the witnesses against defendant, had a motive in that the victim apparently had some kind of an affair with Olivieri's wife. Evidence of motive is relevant and material in circumstantial evidence cases in weighing evidence (*People v Fitzgerald,* 156 NY 253, 258). However, it is not dispositive. Weighing evidence is the function of a properly instructed jury. The evidence as to motive and as to the events was fully submitted to the jury.

The remaining question relates to the admission into evidence of police testimony relating defendant's father's response to defendant's statement in the police precinct:

DEFENDANT: "If I ever find out who ratted me out, I will kill the guy."

FATHER: "That is why you are here, because of your fucking temper."

The father's statement was inadmissible. However, that is not dispositive. The error was harmless in our view (*People v Crimmins,* 36 NY2d 230, 242).

Obviously, there were serious questions of credibility. However, these were for the jury, even in a circumstantial evidence case. Once resolved against the defendant, we are required to accept their verdict, unless the testimony is insufficient or incredible as a matter of law. Such is not the case here.

As further stated in *Kennedy* (*supra,* p 203): "The circumstantial evidence * * * must be viewed in the light most favorable to the People since they have prevailed at trial and thus we are required to assume that the jury credited the People's witnesses (*People v Montanez,* 41 NY2d 53, 57)."

Applying this standard to the circumstantial evidence in this case, the conviction should be affirmed.

Accordingly, the judgment of the Supreme Court, Bronx County (John Collins, J.), rendered January 13, 1983, convicting defendant after a jury trial of manslaughter in the first degree and sentencing him to an indeterminate term of imprisonment of 6 to 18 years, should be affirmed.

KASSAL, J. (concurring). In the early morning hours of March 7, 1982, the body of Frank Cirillo was found with a bullet in the head in the driver's seat of a vehicle parked in

front of the entrance to the Park Tavern in The Bronx. Ralph Mazzella, the bartender at the Park Tavern, had known defendant for six or seven years and Joseph "Joey Dee" Olivieri for a couple of months. At the time of the shooting, Olivieri, his wife and the defendant, were in the bar, which was admittedly crowded. At some point, it was announced that Cirillo had been shot. Olivieri, who was seated at the bar with defendant, asked Giuliano, "What the fuck did you do?" According to Mazzella, the question was posed to defendant, not shouted in his direction, as is suggested by the dissent. Olivieri testified that after Mazzella told him to call the police, he dialed 911 and heard someone in the bar say "I shot him." While he was not certain that it was defendant since appellant was behind him and there were people in the doorway screaming, he stated, "In my opinion it might have been the voice of Joe Giuliano, but I am not sure, my back was towards him." In any event, Olivieri, who was a good friend of the defendant for about five years, testified: "It sounded like him but I am not sure."

Edward Cullen, who had entered the bar with Frank Petrucci, also known as "Frank Serpico", also heard someone say, "I shot the kid", but claimed he did not recognize the voice. However, Cullen admitted at the trial to having testified before the Grand Jury, "I think it was Joe Giuliano * * * I thought I heard him say I shot the kid." Cullen also admitted having seen Giuliano in the bar at the time the statement was made.

The deceased, who had accompanied Cullen and Petrucci to the Park Tavern, remained outside in the car while the other two went inside. The car was parked directly in front of the entrance to the bar, in such a manner as to be clearly visible when the door to the bar was opened. As Cullen and Petrucci entered, Olivieri's wife said, "Why did you do that, what the fuck did you bring him here for?" Cirillo, it appears, had been dating Olivieri's wife during the period of time when Olivieri was imprisoned on one of two prior felony convictions.

About two days after the killing, on or about March 9, 1982, Patricia Salargo, while present at a different bar, the Spirits Pub in Queens, had a conversation with a man, who

was subsequently identified by Sal Avila as the defendant. The only description offered by Salargo was that the man was "a John Travolta type." After "[m]aybe about two" drinks, at the time when the bar was not crowded, with only six or seven people inside, a man sitting to her right asked for a cigarette and told her "he was depressed about breaking up with his girl friend and about his future was planned and he didn't feel so bad about breaking up with his fiancee as he did as having the boy that she was out with done away with or blown away". Although she glanced in his direction, she was not "really paying that much attention" and was not good at faces.

Sal Avila, a college graduate, who had majored in political science and who had known Salargo, having seen her on prior occasions, was also at the Spirits Pub. He positively identified defendant as the person with whom Salargo had been talking. Avila had also spoken to defendant in the bar for 20 or 30 minutes prior to the time he observed Salargo conversing with him. From the transcript, it appears that Avila knew the others who were in the Spirits Pub, but he did not know the defendant and the other man who entered the bar at the same time.

On April 13, 1982, Avila appeared at the police precinct to view a photograph array. He positively identified defendant as the person he had observed in the Queens bar, talking with Salargo. At that time, he had no knowledge that there had been a killing. At a prior examination of photographs on March 23, 1982, he expressed some uncertainty as to whether it was defendant he had seen in the bar, although he selected Giuliano's photo from the array. Later, after defendant's arrest, Avila did make a positive identification of Giuliano in a lineup. He also made a positive in-court identification of the defendant as the person he had observed with Salargo in the Spirits Pub, a significant fact overlooked by our dissenting colleague. While there was testimony by defendant's friends and relatives that, on March 9, 1982, appellant was playing cards at his father's home and, therefore, could not have been present in the Spirits Pub, the credibility of the witnesses who appeared at trial is more appropriately a matter for the jury. In addition, although Avila testified

that the meeting in the Queens bar occurred on March 9, which was a Tuesday, he had thought it occurred on a Monday and Salargo was uncertain whether the encounter took place on a Monday or a Tuesday.

The Trial Justice properly admitted the conversation overheard by the police between defendant and his father while appellant was being held at the police precinct. Detective Meda, who was doing paperwork at a desk some 15 feet from the holding pen, heard defendant tell his father in a loud voice, "If I ever find out who ratted me out, I will kill the guy," in response to which appellant's father said, "That is what you are here for because of your fucking temper." The statement, while not amounting to a confession, was a form of admission and, although recognized by the Trial Justice to be "the weakest form of evidence", does reflect some evidence of a consciousness of guilt. Appellant's statement was not hearsay, as suggested by the dissent, nor was there any objection to the testimony as to the father's response so as to preserve any issue for our review.

Similarly, it was for the Trial Justice to pass upon the credibility of the officers in terms of their having overheard the statement by defendant to his father. While they never made a notation of the conversation and never informed their superior officers, the Assistant District Attorney (ADA) who responded to the arrest was advised of the content of the statement. In this regard, ADA Collazo testified at a hearing during the trial that he did not believe he was in a position to determine whether the statements could be used and directed the officer to speak to the Deputy Chief District Attorney in charge of homicide Grand Jury, who the officer would be seeing in the morning. However, ADA Collazo had recorded the fact that the defendant had made a confession and that the "A/O [arresting officer] has names." The trial assistant prosecuting the case, it further appears, did not learn of the statement until the *Wade* hearing (388 US 218). Finding no impropriety under the circumstances, the trial court referred to Collazo's testimony that he was overburdened at the time, having handled three homicides that night and, in addition, "he was still a very inexperienced assistant district attorney * * * [who] clearly did not appreciate

the significance of the overheard conversation." As a result, the court denied the motion to dismiss the indictment. I agree with that determination and with the court's conclusion as to the propriety of the trial assistant's conduct.

The police investigation in connection with the crime disclosed that Cirillo had been shot by a .22 caliber weapon, which was never recovered. It is undisputed that several weeks prior to the shooting, Cullen had sold a .22 caliber derringer to Giuliano. While the dissent stresses the absence of powder burns on the body, which it is suggested would be present "had the deceased been shot within a close distance," the ballistics expert, Detective Colangelo, testified that "you would have to be somewhere between at least 18 to 24 inches away * * * from the target for the powder not to reach the target." The dissent also expresses the view that a derringer "has the most limited range" and "is highly inaccurate." While Colangelo conceded that a derringer was a defensive type of weapon, "a closeup gun", he did testify that, in his opinion, "it would be very vague over ten yards" away. The record does not reflect the distance of the gun from Cirillo when he was shot.

In reaching the conclusion that the evidence "at trial was inadequate to support the verdict," our dissenting colleague has inappropriately considered matter dehors the trial record, consisting of proof presented at a prior, extensive suppression hearing but which was never before the jury. The dissent refers to the inability of Patricia Salargo to positively identify Giuliano as the person with whom she had spoken in the Queens bar about two days after the killing. At that omnibus hearing, Salargo testified that she had been shown two sets of photographs, front and side views, but she was not certain as to which of the two individuals she had met at the Queens bar, selecting two photos of two individuals. The record, however, does not reflect that she selected the photos of defendant and Joseph Olivieri. Following the hearing, the court expressed the view that it would exclude any testimony by Miss Salargo purporting to identify defendant and, at trial, none was elicited. Therefore, her inability to make a positive identification at an inadmissible photo array is irrelevant.

Her testimony is contained in only 7 pages of the more than 700-page trial transcript. Of course, had she testified at trial that the person in the bar looked like Giuliano, the prior equivocal identification would be relevant on credibility. However, there was no identification testimony at the trial from this witness. Plainly, her failure to identify defendant has no bearing upon the sufficiency of the proof at the trial.

Thus, in considering the sufficiency of the evidence, it is necessary to segregate the proof at trial from that presented at the suppression hearing. I disagree with the dissent's failure to do this and with this mingling of evidence in a case founded primarily upon circumstantial evidence. Where the guilt of a defendant is sought to be established by circumstantial proof and, where identification and credibility are central issues, the jury, as the trier of the facts, has the responsibility for such determinations, not an appellate court. (*People v Siu Wah Tse,* 91 AD2d 350, 352, lv to app den 59 NY2d 679.)

Convictions based upon circumstantial evidence are subject to strict judicial scrutiny (*People v Kennedy,* 47 NY2d 196). The legal sufficiency of the evidence, however, is to be judged in a light most favorable to the prosecution (*People v Contes,* 60 NY2d 620). On review of the record, I find that there were factual issues which were properly and fully submitted to the trier of the facts to determine whether it was the defendant who made the statement in the Bronx bar and whether in fact he had the conversation with Salargo in the Queens bar, where he admitted having "blown away" Cirillo. Taking into account the close personal relationship between Olivieri and defendant and the prior inconsistent statement by Cullen before the Grand Jury, it was for the jury to determine the critical issues, namely, whether it was defendant who, at the time of the killing, proclaimed, "I shot the kid", the credibility of the witnesses who appeared at trial, and whether either Salargo or Avila were intoxicated at the time of the occurrence of the events at the Spirits Pub. Moreover, Avila's positive identification of defendant as the person he observed in conversation with Salargo, both at trial and at the lineup after defendant's arrest, was also for the jury.

The fact that the arrest and lineup identification occurred weeks after the commission of the crime is not significant, particularly considering the detailed and lengthy investigation which had been conducted.

While the dissent suggests that it was Olivieri who had a real motive to commit the crime and the defendant did not, there was no evidence, circumstantial or otherwise, to implicate Olivieri. Motive alone is insufficient. All of the circumstantial proof in the case, including the statements by defendant which evidence a consciousness of guilt, all pointed in appellant's direction. In any event, Olivieri's possible role, the existence of a motive on his part and the absence of any motive by defendant were argued in summation and were fully presented to the jury.

It is impossible to determine to what extent the jury relied upon the positive identification by Avila. Clearly, as found by the Trial Justice, Avila had more than a sufficient opportunity to observe appellant at close range over an extensive period of time, during the course of their conversation at the Spirits Pub and while he observed defendant and Salargo conversing at the bar. Essentially, the proof, albeit circumstantial, and the credibility of the various witnesses at trial were for the trier of the facts, which had received full, proper and careful instructions on the role of circumstantial evidence from an experienced and competent Trial Judge.

Accordingly, the judgment, Supreme Court, Bronx County (John Collins, J.), rendered January 13, 1983, convicting defendant after a jury trial of manslaughter in the first degree and sentencing him to an indeterminate term of imprisonment of 6 to 18 years, should be affirmed.

MILONAS, J. (dissenting). The defendant was convicted, following a jury trial, of manslaughter in the first degree and received an indeterminate sentence of imprisonment of from 6 to 18 years. Although on appeal he contends that a reversal is mandated on a variety of grounds, only one of these is sufficiently meritorious to warrant discussion. In my opinion, the evidence introduced at trial was inadequate to support the verdict.

At approximately 9:30 P.M. on March 6, 1982, defendant and one Joseph Olivieri went to the Park Tavern, located

near the intersection of Victor and Morris Park Avenues in The Bronx. Olivieri's wife, Deborah, arrived about 11:00 P.M. and joined her husband and the defendant at the bar. Later that night, Frank "Serpico" Petrucci, Edward Cullen and Frank Cirillo drove to the same place. Cirillo remained in the vehicle while his companions entered the Park Tavern and approached Deborah Olivieri. They notified her that Cirillo, a former lover, was waiting in the car and wished to speak to her, but she refused to see him. At around 1:00 A.M., Ralph Mazzella, the bartender at the Park Tavern, was advised by a patron that someone had been shot outside. Although Mazzella asserted that the defendant was not in his sight at the precise time, he admitted that the bar was crowded that night and the defendant could well have been in another part of the saloon.

Shortly thereafter, Mazzella supposedly heard Joseph Olivieri shout in the direction of defendant, "What the fuck did you do?" Joseph Olivieri and Cullen stated that someone who might have been the defendant had replied, "I shot him" or "I shot the kid." Despite the fact that both men were acquainted with the defendant, neither was certain that it was his voice which had made the admission. Olivieri also claimed that the follwing day when he asked the defendant what had happened, the defendant answered that he didn't want to talk about it because he had been "pretty high" and, therefore, didn't know. Moreover, Edward Cullen testified that in early 1982, he had sold a .22 caliber derringer to Cirillo but later reacquired the gun and resold it to the defendant. According to an analysis of the remains of the bullet recovered from Cirillo's body during the autopsy, it was .22 caliber and could have been discharged from either a rifle, semiautomatic pistol or a derringer. There were no powder burns on the body.

Police Officer Michael Pacella, who responded to the radio report of the shooting, discovered Cirillo's body slumped forward in the driver's seat of an automobile parked near the Park Tavern, blood trickling from the right side of his head. On March 7, 1982, Detective John Meda was assigned to investigate the homicide. Based upon confidential information supplied to the police de-

partment, he narrowed the suspects to Joseph Olivieri and Joseph Giuliano, the defendant herein. He thereafter prepared three photographic arrays, two of which displayed defendant's picture along with other individuals (one array contained profile shots, the other front facial views) and the third exhibited a photograph of Olivieri and other persons. The photographic arrays were subsequently shown to three people, Patricia Salargo, Sal Avila and Virginia Sweden, who were allegedly present in the Spirits Pub, a Queens bar, some two days after the crime in question when Salargo claimed to have heard a man admit to killing someone. Sweden had initially advised the police that she was with Salargo in the bar, but she was unable to make an identification, and it was later discovered that she had not even been there at the time.

It was Salargo's contention that at some point during the evening of March 9, 1982, she was sitting at the bar in the Spirits Pub, having consumed a number of Bacardi and Coke drinks, when she was engaged in a short conversation by a stranger whom she described as a "John Travolta type". This man purportedly told her that he was depressed about breaking up with his fiancée and "having the boy that she was out with done away with or blown away". Although it was not presented at trial, the record on appeal reveals that, after viewing the two photographic arrays which contained the defendant's picture, she was unable to positively identify the person in the Spirits Pub. She did pick out two photographs from each of the arrays, that of the defendant and Joseph Olivieri, commenting that they both looked similar to the man with whom she had spoken in the bar.* On the same date, Sal Avila, another patron of the Spirits Pub on the night of March 9, selected the defendant's photograph but indicated some doubt concerning his choice. Some three weeks later, he was again shown the arrays, and, on this occasion, he did not express any further uncertainty. It was Avila's testimony that he had arrived at the bar at 3:30 P.M. in the afternoon, having eaten lunch some two hours earlier. He began drinking

---

\* This dissent has in one instance referred to a matter in the record on appeal which was not in the trial transcript. This was done on a subject which was certainly not crucial to the result but was employed merely to help explore the substance and quality of the People's case.

beer and had consumed about nine of them by eight o'clock when he first noticed the individual whom he subsequently identified as the defendant. Salargo, a casual acquaintance as a result of her occasional visits to the Spirits Pub, was also present that night, and, from a distance of several feet away, he observed her in conversation with this unknown person. He, himself, stood next to the man for a period of 20 to 30 minutes.

Based upon Salargo's account and Avila's testimony, as well as the fact that the defendant had been in the Park Tavern at or near the time of Cirillo's shooting, the defendant was placed under arrest. He was brought to the 43rd Precinct where he was eventually visited by his father. The defendant and his father engaged in a conversation next to the holding cell, and detectives purportedly overheard the defendant tell his father something to the effect that: "If I ever find out who ratted on me, I will kill the guy." His father then allegedly replied, "That is why you are here, because of your fucking temper." The defendant's father denied at the trial that he or his son had made the statements attributed to them. The defendant was later transferred to the 48th Precinct. Sal Avila was advised that he was to look at five individuals and determine whether he recognized one as the man whom he had seen in the Spirits Pub. A lineup was then conducted and Avila identified the defendant.

The defendant called eight witnesses on his own behalf, his parents and assorted other relatives, as well as several family friends. They all asserted that the defendant was at his father's home playing cards throughout the evening of March 9, 1982, the night that he was supposedly present in the Spirits Pub talking to Salargo. Further, his mother and father both stated that there were no police detectives present in the room when the defendant and his father spoke to each other at the precinct house. The defendant's brother insisted that he was with the defendant at the Park Tavern on March 6-March 7 and that the latter never left the premises prior to the shooting. In addition, there was testimony that the defendant was not known to have a fiancée.

An examination of the evidence against the defendant reveals it to have been not only entirely circumstantial,

but extremely equivocal. Two nights after the shooting, a man unknown to Patricia Salargo and never identified by her, described only as a "John Travolta type", in the course of casual conversation in a Queens bar admitted to her that he had "done away with or blown away" a guy whom his girlfriend had dated. However, there was absolutely no indication that the defendant had a fiancée or girlfriend. Another individual, Sal Avila, who did not hear any part of the conversation in question, subsequently claimed that he had observed the defendant speaking with Salargo. When a photographic array containing the defendant's picture was initially exhibited to Avila, he had some difficulty making the identification but his memory grew firmer with a second showing. It should be noted that both Salargo and Avila had consumed a quantity of alcoholic beverage during their visit to the Spirits Pub and prior to any contact with this unknown person.

The remainder of the incriminating evidence involved Cullen's having sold a .22 derringer pistol to the defendant several weeks before the homicide and the fact that Cirillo could have been killed with a derringer. Of course, according to the expert testimony, he could also have been shot with a rifle or a semiautomatic, and of the three possible types of murder weapons, the derringer has the most limited range and is, additionally, highly inaccurate. Yet, there were no powder burns on the body, which would have been present had the deceased been shot within a close distance, and Cirillo died of a gunshot wound to the back of the head. Although it is clear that the defendant had been in the Park Tavern at or around the time of the shooting, no one saw him leave the bar (and the place was very crowded that night), and there was no testimony that he was carrying a weapon, either the derringer or any other kind. As to the defendant's alleged inculpatory statement in the Park Tavern, neither Cullen, who admitted to an extensive criminal record, nor Olivieri, both of whom were well acquainted with him, actually recognized the voice responsible for this admission. While Olivieri did assert that on the following day, the defendant contended that he had been "pretty high" the night before and didn't know what had happened, such a remark is not particularly

incriminating and, besides, the proof introduced at trial is scarcely more or less suggestive of the defendant's guilt than that of Olivieri. Since Olivieri's wife had engaged in an affair with Cirillo, he at least had a conceivable motive to kill the deceased. The defendant had none, or at least none that is apparent from the evidence. Indeed, there is not even a hint of malice or ill-feeling between the defendant and Cirillo. Finally, there is the conversation between the defendant and his father in the station house which the detectives purportedly overheard. Aside from the questionable admissibility of such hearsay statements, the witnesses who supposedly testified to them conceded that they never entered any notations regarding the conversation, never informed their superiors of it, and did not relate it to the Grand Jury. Moreover, the statement itself, even if accepted at face value, is hardly a confession of guilt.

Certainly, there is nothing inherently suspect about a conviction founded upon circumstantial evidence. As the Court of Appeals explained in *People v Cleague* (22 NY2d 363, 367): "Indeed, circumstantial evidence is generally stronger, at least when it depends, as it often does, upon undisputed evidentiary facts about which human observers are less likely to err as a matter of accuracy or to distort as a matter of motivation, emotional shock, or external suggestion. On the other hand, direct evidence almost always, even in the instance of bystanders, is subject to one or more of these psychological infirmities * * * But circumstantial evidence is as nothing unless the inferences to be drawn from the circumstances are logically compelling. The danger, therefore, with the use of circumstantial evidence is that of logical gaps — that is, subjective inferential links based on probabilities of low grade or insufficient degree — which, if undetected, elevate coincidence and, therefore, suspicion into permissible inference."

Thus, the long-established rule in New York State is that a criminal conviction derived from circumstantial evidence is subject to strict judicial scrutiny. (*People v Kennedy*, 47 NY2d 196.) Such "close judicial supervision is necessary to ensure that the jury does not make inferences which are based not on the evidence presented, but rather on unsupported assumptions drawn from evidence equivo-

cal at best" (*supra,* p 202). In that connection, the conclusion of guilt must be consistent with, and flow naturally from, the proven facts, and the facts, when viewed as a whole, must exclude to a moral certainty every other reasonable hypothesis. (*People v Way,* 59 NY2d 361; *People v Barnes,* 50 NY2d 375; *People v Piazza,* 48 NY2d 151; *People v Kennedy, supra; People v Benzinger,* 36 NY2d 29; *People v Borrero,* 26 NY2d 430.)

Since the issue here is the sufficiency of the circumstantial evidence, the facts must be considered most favorably to the People, the prevailing party at trial. (*People v Way, supra; People v Kennedy, supra; People v Benzinger, supra; People v Cleague, supra.*) In applying that standard, the proof in the instant case was adequate to demonstrate that Frank Cirillo was found in an automobile outside the Park Tavern in the early morning of March 7, 1982, shot in the head with a .22 caliber bullet. The defendant herein, along with many other people, was present in the bar at or near the time of the killing, and several weeks prior to the incident he had purchased a .22 caliber derringer from Edward Cullen. Practically every other aspect of the prosecution's case gives rise to reasonable doubt. There was no evidence of motive or of intent. While motive is not an indispensable element in a homicide, it is certainly a factor to be considered by the jury. (See *People v Rumble,* 45 NY2d 879.) Where, as in the matter before us, the evidence does not point unmistakably to the defendant, the absence of any motive whatever is significant. In that regard, only Joseph Olivieri, whose wife had had an affair with the deceased, had any obvious reason to kill the deceased. Indeed, there was even some indication of a quarrel between Olivieri and Cirillo prior to the latter's death.

The .22 caliber bullet removed from the deceased's body was never matched with any weapon because no weapon was ever located. Further, the bullet could have been discharged not only from a derringer but a rifle or a semiautomatic pistol as well, either of which is considerably more accurate than a derringer when fired from the distance from which Cirillo was evidently shot (considering the absence of powder burns). There is also no proof that the defendant possessed a firearm at the time of the

homicide, merely that some weeks earlier he had purchased a derringer. As for the defendant's alleged statement in the Queens bar, the fact is that this entire case rests largely upon Avila's identification of the defendant as the individual whom he had observed in conversation with Salargo. His identification, at first hesitant, was made weeks after he had purportedly encountered the defendant, a stranger to him. By the time Avila came into contact with the defendant, he had already imbibed a large quantity of alcohol on what was, in effect, an empty stomach. Salargo, on the other hand, was unable to identify anybody. She only spoke for a few moments to the person who made the admission to her and did not know who he was. Moreover, she talked with a number of other people that night, and it is not even clear that the man whom Avila had in mind was the same person who made the telltale statement. There is, in addition, absolutely no evidence that the defendant was in the habit of frequenting the Spirits Pub or that he had ever patronized that bar on any occasion other than the one on which he was supposedly seen there by Avila.

Although the evidence offered at trial does support speculation that the defendant may, in fact, have been responsible for Cirillo's death, a conviction may not be based upon speculation or mere suspicion. Under the circumstances of this case, we can just as easily conjecture about Olivieri's possible role or that of someone else as yet undetected. In any event, the facts herein do not eliminate every reasonable hypothesis but that of guilt and are not inconsistent with the defendant's innocence. (See *People v Way, supra; People v Barnes, supra; People v Cleague,* 22 NY2d 363, *supra.*) Consequently, the defendant's conviction should be reversed and the indictment dismissed.

Accordingly, the judgment of the Supreme Court, Bronx County (John P. Collins, J.), rendered on January 13, 1983, which convicted the defendant, following a jury trial, of manslaughter in the first degree and sentenced him to an indeterminate term of imprisonment of from 6 to 18 years, should be reversed, on the law, and the indictment dismissed.

CARRO, J. P., and ASCH, J., concur with FEIN, J.; KASSAL, J., concurs in an opinion; MILONAS, J., dissents in a separate opinion.

Judgment, Supreme Court, Bronx County, rendered on January 13, 1983, affirmed.